Gweldon PASCHALL, Plaintiff,

and

all Intervenors

v.

The KANSAS CITY STAR
COMPANY, Defendant.

No. 75CV36–W–4.

United States District Court,
W. D. Missouri, W. D.

Oct. 27, 1977.

Sheridan Morgan, Donald Loudon, David Rhodus, Morris, Mitchell, Larson, King, Stamper & Bold, Kansas City, Mo., for plaintiff.

John T. Martin, Sam Colville, Everett Olson, Gary Whittier, Shook, Hardy & Bacon, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

ELMO B. HUNTER, District Judge.

### I

### INTRODUCTION

This action now pends before the Court on plaintiffs' motion for a preliminary injunction.

Plaintiffs, independent contract carriers who have contracted with defendant newspaper company, The Kansas City Star Company (The Star), to deliver The Star's newspapers and advertising materials to the public, attack as illegal certain portions of The Star's plan to alter its method of product distribution. This plan, publicly announced by The Star in The Kansas City Star newspaper of September 26, 1977, consists of three parts: First, The Star would terminate all existing contracts with its independent contract carriers as of December 1, 1977. Second, The Star would thereafter deliver and sell its newspapers directly to subscribers. Third, The Star would no longer supply its product to persons, such as plaintiffs, who desire to conduct a business consisting of the retail distribution of defendant's product to the public.[1]

Plaintiffs do not contest the Star's proposal insofar as it contemplates direct retailing by The Star of its product to consumers. Plaintiffs concede The Star has this right. Plaintiffs do, however, contest The Star's right to accompany its proposed retail distribution scheme with its plan to terminate its existing relationship with plaintiffs. Plaintiffs, in oral argument at the full evidentiary hearing on the preliminary injunction issue, summarized their position thus: The Star must continue to sell its newspapers to the independent carriers at present contract prices, and the independent carriers may sell and deliver these papers in competition with The Star.

### II

### BACKGROUND

The Star publishes, prints, and distributes its newspapers from its offices at 1729 Grand Avenue, Kansas City, Missouri thirteen times per week. Since approximately 1880, The Star has contracted with various independent parties for delivery of its newspapers and advertising materials to the public. Plaintiffs (contract carriers) are

---

1. A copy of the typical contract presently governing the rights and duties of The Star and the independent contract carriers is attached to this Opinion as Appendix A. A copy of the proposed contract, under the new system, is attached as Exhibit B.

presently parties to such contracts with The Star; however, The Star also has over 500 contracts for home newspaper delivery service with persons not parties to this action. The present distribution system has the following characteristics:

a) Title to The Star's product passes twice: first, when The Star delivers its paper to the contract carrier and, second, when the contract carrier delivers the paper to the consumer.

b) Each contract carrier sets his own retail price to newspaper subscribers and other customers, subject to the effect of the wholesale percentage pricing.

c) The contract carriers are permitted to, and do in fact, charge subscribers and other customers different rates.

d) The contract carriers may impose additional charges for special types of delivery.

e) The contract carriers assume the risk of noncollection of charges to home delivery subscribers.

f) The contract carriers normally assume the risk of damaged or nondelivered newspapers.

g) The Star may not legally control the rates or prices charged by the contract carriers to home delivery subscribers.[2]

h) The contract carriers are not required to, nor do many of them in fact, physically deliver newspapers but, instead, employ or contract with a third party to make such deliveries.

The distribution method proposed by The Star to be implemented effective December 1, 1977 has the following characteristics:

a) The Star will sell its newspapers directly to subscribers and other customers.

b) The Star will have the responsibility for all subscriber and customer solicitation.

c) The Star will assume all risk of loss of newspapers and credit risks respecting customers. However, to the extent that 100% of collections are not made, The Star's agent will not receive his portion of the uncollected amounts.

d) The Star will bear all risk of damaged or nondelivered newspapers.

e) Title to the newspaper will pass but once (from The Star to the consumer), passage of title to occur upon delivery to the subscriber.[3]

f) The Star will receive all subscriber and customer complaints and is to be responsible for service of all subscriber and customer requests.

g) The Star will be able to set uniform prices charged to home delivery subscribers.

Under the proposed distribution system, The Star states that it will have more control over the quality of newspaper delivery service to subscribers and other customers. However, while subscription rates are expected to be the same or lower in some instances under the proposed system, in most instances, rates will be higher.

Perhaps a more thorough understanding of the distinctions between the present and proposed system will result from an examination of certain statements made by the Star itself. With regard to the present distribution system, The Star, in a statement published in 1947, said:

There are 208 contract carriers of The Star in Greater Kansas City. These men

---

2. Stipulated Narrative Facts, ¶ 29 (October 19, 1977).

3. With regard to passage of title and risk of loss, the proposed contract provides: "Newspapers to be supplied to Delivery Agent hereunder shall remain the property of The Star until delivery to all regular subscribers and others designated by The Star. Accordingly, risk of loss of newspapers and credit risks respecting customers shall remain that of The Star; provided however, that nothing herein shall limit Delivery Agent's liability to The Star for any negligent or wrongful act respecting delivery of the newspapers or monies collected by Delivery Agent or otherwise. Delivery Agent shall be the agent of The Star for collection and delivery only and shall have no right or authority to assume or create any other obligation of any kind, expressed or implied, on behalf of The Star, it being intended that Delivery Agent shall be and remain an independent contractor." Exhibit M, "Delivery Agent Contract," ¶ 3.

own their own routes and have in many instances large investments in them. They buy their papers from The Star wholesale at specified rates. They either deliver these papers themselves or employ assistants or helpers to deliver them. They own their own equipment which they use to transport the papers for delivery. They handle their own collections and operate as independent merchants or contractors, each with an individual contract which defines specifically his relationship to The Star.[4]

By letter dated May 24, 1974 from The Star's circulation manager to all independent contract carriers, The Star stated:

The Star enters into a personal service contract with an independent contractor to sell newspapers at wholesale for the independent contractor's resale and delivery as provided in the contract. The carrier is not an employee of the Star but rather is an independent contractor who undertakes to resell and deliver the newspapers purchased by him in a prompt and satisfactory manner.[5]

The existing contract between defendant and its carriers provides:

It is agreed by and between the parties that first party [the contract carrier], his agents and employees, in delivering and selling the newspapers herein mentioned, is acting as principal, on his own responsibility, and in no particular is he acting for, or in behalf of, or as agent of second party [the Star], and said first party shall have no right, power or authority to bind second party by any act or deed on his part or on the part of any of his agents, servants or employees, and first party agrees to indemnify and hold harmless second party from any loss of liability of whatsoever kind and character, arising out of or in any manner connected with the execution of this contract.[6]

By letter dated September 24, 1977 from The Star's Chairman of its Board of Directors to all independent contract carriers, The Star stated:

On September 23, 1977, the Kansas City Star Company determined that effective December 1, 1977, it must change its method of distributing its newspapers.

Effective December 1, 1977, the Star Company will no longer sell its newspapers to independent contract carriers but will sell directly to subscribers with delivery to be made by independent delivery agents. Therefore, effective December 1, 1977, the contract between you and The Kansas City Star Company for newspaper sale and delivery is terminated.

An agent who enters into a new contract with The Star Company will be paid by The Star Company for each newspaper delivered and a percentage of the monies collected from all subscribers in the area where delivery is made by the Agent. It is the desire of The Star Company that under the new delivery arrangement you as an agent will be compensated approximately the same amount of money per regular subscriber as you presently receive. If you are interested in contracting with the Star Company for delivery of its newspapers and collecting from the Star Company's regular subscribers, please contact the Circulation Department for an appointment to discuss the terms of the contract.[7]

The contract presently in effect between the independent contract carriers and The Star provides the following formula for computation of the compensation to be received by the Star and the carriers:

First party [the carrier] agrees to pay to second party [the Star] for all newspapers purchased by him and delivered by him to regular subscribers at the following rates: _____ percent (____%) of the entire amount charged by first party (excluding sales or use taxes) to each regular subscriber for The Kansas City Star, The Kansas City Times, and the Sunday edition of The Kansas City Star, computed

4. Exhibit I.

5. Exhibit D.

6. Exhibit K.

7. Exhibit C.

on a weekly basis; _____ percent (_____%) of the entire amount charged by first party (excluding sales or use taxes) to each regular subscriber for The Kansas City Star and the Sunday edition of The Kansas City Star, computed on a weekly basis; _____ percent (_____%) of the entire amount charged by first party (excluding sales or use taxes) to each regular subscriber for The Kansas City Times and the Sunday edition of The Kansas City Star, computed on a weekly basis.

For all extra copies of newspapers ordered by first party which are not distributed to regular subscribers but which are to be sold to newsboys or dealers or direct at retail to purchasers (or as a second copy of The Times, Star or Sunday Star to regular subscribers) first party agrees to pay as follows: _____ cents per copy for The Kansas City Star, _____ cents per copy for The Kansas City Times, and _____ cents per copy for the Sunday edition of The Kansas City Star.[8]

According to the testimony, the rate generally collected by The Star was 38% of the price received by a carrier from a "full subscriber" (one who subscribes to thirteen papers per week) and 37% of the price received by a carrier from a "split subscriber" (one who subscribes to 7 papers per week).

Under the proposed contract, compensation of the carriers would be governed by the following language:

6. The Star will pay Delivery Agent a fee of _____ cents (_____¢) per copy for each Monday through Saturday edition of the newspaper delivered by Delivery Agent to regular subscribers designated by The Star.

7. The Star will pay Delivery Agent a fee of _____ cents (_____¢) per copy for each Sunday edition of the newspaper delivered by Delivery Agent to regular subscribers designated by The Star.

8. The Star will pay Delivery Agent a fee for each newspaper delivered by Delivery Agent to each customer designated by The Star, other than regular subscribers, or for samples Delivery Agent is requested to deliver by Star, as follows: _____¢ per copy for the Monday through Saturday edition of the newspaper and _____¢ per copy for the Sunday edition of the newspaper.

9. Delivery payments shall be made by The Star to Delivery Agent by the tenth day of each month or on the first regular business day thereafter for newspapers delivered by Delivery Agent during the preceding calendar month.

10. The Star will pay Delivery Agent a fee based on the following percentages of all monies (excluding sales or use taxes) collected or received from those to whom Delivery Agent makes delivery who subscribe to the Monday through Saturday editions of The Kansas City Times and The Kansas City Star newspapers and the Sunday edition of The Kansas City Star newspapers.

| Percentage of Collection | Collection Fee |
|---|---|
| 0– 75% | ___% of the sum collected, plus |
| 76– 90% | ___% of all sums collected over 76%, plus |
| 91–100% | ___% of all sums collected over 91% |

11. The Star will pay Delivery Agent a fee based on the following percentages of all monies (excluding sales or use taxes) collected or received from those to whom Delivery Agent makes delivery who have subscribed to the Monday through Saturday editions of The Kansas City Times newspapers and the Sunday edition of The Kansas City Star newspaper or Monday through Saturday editions of The Kansas City Star newspapers and the Sunday edition of The Kansas City Star newspaper.

| Percentage of Collection | Collection Fee |
|---|---|
| 0– 75% | ___% of the sum collected, plus |
| 76– 90% | ___% of all sums collected over 76%, plus |
| 91–100% | ___% of all sums collected over 91% |

8. Exhibit K.

12. The Star will pay Delivery Agent a fee based on the following percentages of all monies (excluding sales or use taxes) collected or received from those to whom Delivery Agent makes delivery who have subscribed to the Sunday edition of The Kansas City Star newspaper.

| Percentage of Collection | Collection Fee |
|---|---|
| 1– 75% | ___% of the sum collected, plus |
| 76– 90% | ___% of all sums collected over 76%, plus |
| 91–100% | ___% of all sums collected over 91% |

13. The Star will pay Delivery Agent a fee of _____ percent (_____%) of all monies (excluding sales or use taxes) collected or received from customers other than regular subscribers to whom Delivery Agent makes delivery, if The Star designates Delivery Agent to make delivery to and/or collection from such other customers.

While The Star has, at least since 1904, retained the right to compete with carriers in the sale of newspapers,[9] and while The Star does, in fact, occasionally sell newspapers directly to home delivery subscribers,[10] the evidence before the Court indicates that this practice by The Star is so rare as to have but a *de minimis* impact on the distribution system. As the parties have stipulated, "[the] principal present method of distribution employed by defendant, provides in part that defendant sells its newspaper to all carriers, including the plaintiffs and all intervenors, who in turn resell those newspapers to subscribers or other customers."[11]

The existing contract further provides that the "first party [the contract carrier] shall not . . . sell or circulate any other newspaper, except by written consent of second party [the Star], during the existence of this contract."[12] However, the parties have stipulated that

A number of carriers who have requested written permission from defendant in accordance with the terms of the carriers' contract within the last 10 years to deliver another specific newspaper not printed or published by defendant have been granted permission to do so. . .

Defendant has not issued any order or directive preventing any carrier, including the plaintiff or any intervenor, from engaging in outside endeavors.[13]

The proposed contract, on the other hand, provides:

Delivery Agent may engage in any employment or other business so long as it does not interfere or conflict with the prompt, regular and satisfactory performance by Delivery Agent of Delivery Agent's obligations under this contract.[14]

While the existing contract requires the carriers to keep a "route book"[15] "for the benefits of and satisfactory to" the Star and to furnish it to The Star at any time the Star so requests, the proposed contract goes further, stating:

Delivery Agent agrees not to exhibit the subscriber and customer list or disclose any information contained therein

---

9. The existing contract provides: "[F]irst party [the contract carrier] agrees to receive said newspapers and deliver them regularly and promptly each day to all subscribers at their respective residences or places of business along said Route. . . . Second party [defendant] reserves the right to sell newspapers to others anywhere along said Route." Exhibit K.

10. Stipulated Narrative Facts, ¶ 32 (October 19, 1977).

11. Stipulated Narrative Facts, ¶ 6 (October 19, 1977).

12. Exhibit K.

13. Stipulated Narrative Facts, ¶¶ 42, 44 (October 19, 1977).

14. Exhibit M.

15. The route book is to show "the name and address of every delivery on the . . . Route, amounts charged for regular subscriptions, when every subscriber has made payment and the date to which each subscription is paid . . . ." Exhibit M.

or relating to the identity or addresses of any regular subscriber to any person, entity or group other than the authorized representatives of The Star or the employees of Delivery Agent who require such information in order to deliver the newspapers or otherwise comply with this contract, and Delivery Agent agrees to instruct Delivery Agent's employees not to disclose such information.

To further detail the distinctions between the existing distribution system and the proposed system would not serve any useful purpose at the present time. With these facts and distinctions in mind, therefore an examination of the applicable law, as it applies to plaintiffs' request for a preliminary injunction, is in order.

### III

### GENERAL CONSIDERATIONS PERTINENT TO THE PRELIMINARY INJUNCTION ISSUE

The granting or denial of a preliminary injunction is a decision that is required to be exercised in conformity with well-settled and historic equitable considerations. See, 11 Wright & Miller, Federal Practice and Procedure: Civil Section 2947, pp. 423–24 (1973).

An excellent statement of those considerations is set out by the Eighth Circuit Court of Appeals in *Benson Hotel Corporation v. Woods*, 168 F.2d 694 at 696–97 as follows:

> The application for such an injunction does not involve a final determination on the merits; in fact, the purpose of an injunction pendente lite is not to determine any controverted right, but to prevent a threatened wrong or any further perpetration of injury, or the doing of any act pending the final determination of the action whereby rights may be threatened or endangered, and to maintain things in the condition in which they are in at the time and thus to protect property or rights from further complication or injury until the issues can be determined after a full hearing. . . .

> Such a temporary injunction should usually be granted where the questions presented are grave and injury to the moving party will result if it is denied and the final determination should be in his favor, while if it is granted and the decision is unfavorable the inconvenience and loss to the opposing party will be inconsiderable. Ordinarily, the court in its discretion may grant a preliminary injunction where it appears that there is a substantial controversy between the parties and that one of them is committing an act or threatening the immediate commission of an act that will cause irreparable injury or destroy the status quo of the controversy before a full hearing can be had on the merits of the case, and generally such an injunction will be granted whenever necessary to the orderly administration of justice.

Thus, the general purpose of a preliminary injunction is to preserve the status quo pending a final determination of the action on the merits after a full hearing.

■ While the preliminary injunction has the force of a permanent injunction during its period of effectiveness, it is nonetheless interlocutory and is not a ruling on the ultimate merits of the case. As noted by the Eighth Circuit Court of Appeals in *Benson Hotel Corporation, supra*, at 697–98:

> The decision of the trial court on granting the motion for preliminary injunction will not estop either of the parties on the trial of the case on its merits, nor would any determination of those questions by this court on appeal be binding on the trial court nor upon either of the parties in considering and determining the merits of the controversy. . . . There is sound reason for the rule that the decision of either the trial or appellate court in granting or denying the temporary injunction does not constitute the law of the case and will not estop the parties nor the court as to the merits of the case.

■ On the trial on the merits of the case the issues must then be tried as though

no temporary injunction had been applied for or issued.

## A.

### Criteria for the Issuance of a Preliminary Injunction

■ Ordinarily, in order to justify the issuance of a preliminary injunction by the trial court, the movant has the burden of showing:

(1) Substantial probability of success at trial by the moving party, and (2) Irreparable injury to the moving party absent such issuance.

Other factors which may be considered in the decision to grant or to deny the request are the absence of substantial harm to other interested parties, and the absence of harm to the public interest. See, for instance, *Minnesota Bearing Company v. White Motor Corporation*, 470 F.2d 1323, 1326 (8th Cir. 1973). However, these considerations are not the sole basis for the granting or withholding of a preliminary injunction. As stated in the landmark case of *City of Newton v. Levis*, 79 F. 715, 718 (8th Cir. 1897):

A preliminary injunction maintaining the status quo may properly issue whenever the questions of law or fact to be ultimately determined in a suit are grave and difficult, and injury to the moving party will be immediate, certain, and great if it is denied, while the loss or inconvenience to the opposing party will be comparatively small and insignificant if it is granted.

In *Pratt v. Stout*, 85 F.2d 172, 176–77 (8th Cir. 1936) these same basic considerations are stated thusly:

If the questions presented by a suit for an injunction are grave and difficult and the injury to the moving party will be certain, substantial, and irreparable if the motion for a temporary injunction is denied and the final decision is favorable, while if the motion is granted and the decision is unfavorable the inconvenience and loss to the opposing party will be

inconsiderable or he may be protected by a bond, the injunction usually should be granted. . . .

When the nature of the questions which arise upon a suit make them a proper subject for deliberate examination, and if a stay of proceedings will not result in too great injury to the defendants, it is proper to preserve the existing state of things until the rights of the parties can be fairly and fully investigated and determined.

And, as expressed in *Love v. Atchison, T. & S.F. Ry. Co.*, 185 F. 321, 331–32 (8th Cir. 1911), *cert. denied, West v. Atchison, T. & S.F. Ry. Co.*, 220 U.S. 618, 31 S.Ct. 721, 55 L.Ed. 612:

It is a familiar rule of equity jurisprudence that if the questions presented in a suit for an injunction are grave and difficult, and the injury to the moving party will be certain, great, and irreparable if the motion for the interlocutory injunction is denied and the final decision is in his favor, while if the decision is otherwise, and the injunction is granted, the inconvenience and loss to the opposing party will be inconsiderable, or probably may be indemnified by a bond, the injunction usually should be granted.

The above stated considerations and test for the issuance of a temporary injunction received the approval of the Supreme Court in *Ohio Oil Company v. Conway*, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972, 973 (1929), have been variously expressed, and, recently, have been applied in such a manner as to minimize the importance of the movant's showing a likelihood of success on the merits. For example, in *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 526 F.2d 86, 88 (9th Cir. 1975), the Court stated:

The district court denied the [preliminary] injunction sought in this case because of its "serious reservations as to the probability of success on the merits. . . ." . . .

There is, however, an alternative test that the district court did not apply. As

the Second Circuit stated in *Charlie's Girls, Inc. v. Revlon, Inc.,* 483 F.2d 953, 954 (2d Cir. 1973): "One moving for a preliminary injunction assumes the burden of demonstrating *either* a combination of probable success and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor."

The Fourth Circuit in a very recent application of these alternative tests stated:

The district court below erred in holding that plaintiff must first show "likelihood of success" in order to be entitled to preliminary relief. Instead, the first step in a Rule 65(a) situation is for the court to balance the "likelihood" of irreparable harm to the plaintiff against the "likelihood" of harm to the defendant; and if a decided imbalance of hardship should appear in plaintiff's favor, then the likelihood-of-success test is displaced by Judge Jerome Frank's famous formulation:

[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.

*Hamilton Watch Co. v. Benrus Watch Co.,* [2 Cir.] *supra,* 206 F.2d [738] at 740, 743; *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir. 1970). The importance of probability of success increases as the probability of irreparable injury diminishes, . . . and where the latter may be characterized as simply "possible," the former can be decisive. Even so, it remains merely one "strong factor" to be weighed alongside both the likely harm to the defendant and the public interest.[16]

See also *Chicago, B. & Q. R. Co. v. Chicago Great Western R. Co.,* 190 F.2d 361, 363–64 (8th Cir. 1951); *Checker Motors Corporation v. Chrysler Corporation,* 405 F.2d 319, 323 (2d Cir. 1969) *cert. denied,* 394 U.S. 999,

89 S.Ct. 1595, 22 L.Ed.2d 777; *Omega Importing Corp. v. Petri-Kine Camera Company,* 451 F.2d 1190, 1193–94 (2d Cir. 1971); *Costandi v. AAMCO Automatic Transmissions, Inc.,* 456 F.2d 941, 943 (9th Cir. 1972); *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir. 1953).

■ Thus, the "likelihood of success" test is not the exclusive means for determining whether a preliminary injunction should issue; rather, a viable alternative test—the "balance of hardships" test—exists.[17] Because of the unique facts and issues which are before the Court, the latter test will be utilized in assessing the propriety of the issuance of a preliminary injunction in this cause.

### B.

*Irreparable Harm and the Public Interest*

■ While the value of a particular contract carrier's delivery route might be difficult to express in monetary terms, it is not an impossible task. See, *Albrecht v. Herald Company,* 452 F.2d 124 (8th Cir. 1971). That a delivery route's worth is susceptible of monetary valuation does not, however, preclude injunctive relief. 11 Wright & Miller, Federal Practice and Procedure: Civil § 2948, pp. 439–40 (1973) states it thusly:

Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable. Indeed, when the potential economic loss is so great as to threaten the existence of the moving party's business, then an injunction may be granted, *even though the amount of direct financial harm readily is ascertainable.* [Emphasis added.]

Judge Friendly in *Semmes Motors, Inc. v. Ford Motor Company,* 429 F.2d 1197, 1205, (2d Cir. 1970), in applying this principle stated:

Consideration of the propriety of the temporary injunction must begin by recognizing that here, in Judge Frank's

---

16. *Blackwelder Furniture Company of Statesville, Inc. v. Seilig Manufacturing Co., Inc.,* 550 F.2d 189, 195 (4th Cir. 1977).

17. See also, *Atchison, T. & S. F. R. Co. v. Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350, 371, n. 15 (1973).

much quoted phrase, "the balance of hardships tips decidedly toward plaintiff," *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2 Cir. 1953). Ford's contention that Semmes failed to show irreparable injury from termination is wholly unpersuasive. Of course, Semmes' past profits would afford a basis for calculating damages for wrongful termination, and no one doubts Ford's ability to respond. But the right to continue a business in which William Semmes had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award. . . . Moreover, they want to continue living. As Judge Goodrich said, a "judgment for damages acquired years after his franchise has been taken away and his business obliterated is small consolation to one who, as here, has had a Ford franchise" for many years, *Bateman v. Ford Motor Co.*, 302 F.2d 63, 66 (3 Cir. 1962). As against this, the hardship to Ford in continuing the Semmes dealership *pendente lite* was relatively small.

And, as was stated in *Carlo C. Geraldi Corporation v. Miller Brewing Company*, 421 F.Supp. 233, 236 (D.N.J.1976):

"This Court finds that the loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of a preliminary injunction. See, e. g., *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969); *Brennan Petroleum Prods. Co. v. Pasco Petroleum Co.*, 373 F.Supp. 1312, 1316 (D.Ariz.1974); *N. W. Controls, Inc. v. Outboard Marine Corp.*, 317 F.Supp. 698, 703 (D.Del.1970); cf. D. Dobbs, Remedies § 12.18, at 884–5 (1973). Furthermore, the balance of hardships tips decidedly in favor of the plaintiff's position. The plaintiff would clearly suffer major losses without preliminary relief, since Miller products constitute approximately eighty per cent (80%) of the plaintiff's total sales volume. An injunction, on the other hand, would cause little, if any, harm to Miller. In fact, Miller could be said to benefit insofar as it derived profits from the continued sales to the plaintiff. Certainly the public would benefit from the uninterrupted availability of Miller products. Finally, we must also consider that failure to grant preliminary relief would result in economic hardship for the plaintiff's employees."

■ The testimony at the hearing convinces this Court that irreparable harm would result to plaintiffs should a preliminary injunction not issue. Many plaintiffs paid thousands of dollars for their routes. Some borrowed money to finance the purchase and are still paying off their loans. Several testified that they employed others to assist them with the physical delivery of the papers. The Court heard testimony as to the manner in which the carrier established good will among subscribers, the methods by which he encouraged nonsubscribers to subscribe, and the amount of capital investment needed to operate a route. As will be developed later, plaintiffs have raised serious and difficult questions by this suit. Therefore, to deprive these contract carriers of their business until a final decision is reached in this case would be unconscionable.[18] This conclusion is particularly compelling when one considers that The Star has been distributing its newspaper by contract carriers since approximately 1880. In short, noting the gravity and difficulty of the questions raised on the merits, to maintain the status quo pending a final determination on the merits in the near future (that is, to cause defendant to continue its practice of 97 years for several more months) is, when one considers the irreparable damage which would otherwise be done to plaintiffs' busi-

---

18. There was testimony that, because of certain features of the contract carrier's business, to interrupt his business, even briefly, would do substantial damage. This evidence was not refuted.

nesses, the only result which equity and good conscience will allow this Court to reach.

This result is further reinforced by a consideration of the public interest. As stated in *Virginia R. Co. v. System Federation*, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789, 802 (1937):

> Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.

In 7 Moore's Federal Practice, ¶ 65.04[1], p. 65–45 (1975) it states:

> The public interest is also a factor to be considered. When an injunction is sought and the grant would aid the public interest the latter factor is highly relevant.

■ Consideration of the public interest is particularly appropriate in the context of a private antitrust suit where injunctive relief is sought. In *Zenith Radio Corporation v. Hazeltine Research*, 395 U.S. 100, 130–31, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129, 152 (1969) it is declared:

> [T]he purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws.

If it should appear in the trial on the merits, that defendant has transgressed the federal antitrust laws, to term plaintiffs' injuries compensable in money and deny injunctive relief, thereby allowing continuation of violation of the antitrust laws would be highly inappropriate. While satisfying the pocketbook interests of the individual plaintiffs, it would do little to protect the public. This legal principle is stated in *Foremost International Tours, Inc. v. Qantas Airways, Ltd.*, 379 F.Supp. 88, 97 (D.Hawaii 1974), aff'd, 525 F.2d 281 (9th Cir. 1975):

> The danger that Foremost will suffer irreparable injury before the CAB has investigated the charges of deceptive practices and unfair methods of competition is

very real. Foremost has established that the existence of its business life as a competitor in the free-wheeling tour market is threatened. This is a sufficient showing of irreparable injury to warrant a preliminary injunction even though the amount of direct financial harm might be ascertainable. *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (per Friendly, J.); 11 C. Wright & A. Miller § 2948 at 440 (1973). *Courts should be particularly concerned with threats to the existence of a moving party's business in the area of antitrust. An award of only money damages in lieu of preserving a competitor disserves the public interest.* (Emphasis added.)

The conclusion is inescapable that plaintiffs would suffer sufficient irreparable harm from the termination of their contracts with The Star that, if the issues in this cause are found to be "grave, serious, and difficult," a preliminary injunction should issue.

### C.

*An Assessment of the Gravity, Seriousness, and Difficulty of the Questions Presented.*

■ In 1890, Congress passed Section 2 of the Sherman Act. Presently codified as 15 U.S.C. § 2, it has remained substantively intact with but minor amendments, not relevant here, in 1955 and 1974. It presently reads:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

As plain and forthright as the language of this section appears, there are but two

things which may be confidently said about it: First, mere possession of monopoly power [19] does not constitute the offense of monopolization; something more is needed.[20] *United States v. Grinnell Corporation,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed. 778 (1966); *National Wrestling Alliance v. Myers,* 325 F.2d 768 (8th Cir. 1963); *Kansas City Star Co. v. United States,* 240 F.2d 643 (8th Cir. 1957), *cert. denied,* 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957); *Pacific Engineering & Production Company of Nevada v. Kerr-McGee Corporation,* 551 F.2d 790–791 (10th Cir. 1977). Second, concerted action is unnecessary to constitute the offense of monopolization; unilateral monopolization violates the Sherman Act. *Continental Ore Co. v. Union Carbide & Carbon Corporation,* 370 U.S. 690, 709, 82 S.Ct. 1404, 8 L.Ed.2d 777, 790 (1962). It is at this point that a Court's confidence in applying Section 2 of the Sherman Act to the facts before it must end, for it is at this point that the question which has plagued the legal, judicial, and academic communities must be faced: What conduct must a defendant, who possesses monopoly power, engage in before he is to be found guilty of transgressing the dictates of Sherman § 2?

It might be argued that "[s]ize and power are themselves facts some of whose consequences do not depend upon the way in which they were created or in which they are used," [21] "that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough alone," [22] and that therefore, very little conduct should be required before an entity possessing monopoly power is found guilty of monopolization. On the other hand, there is an attractive argument to be made that "[t]he successful competitor, having been urged to compete, must not be turned upon when he wins." [23] The tension and problems occasioned by these competing policy considerations have resulted in a series of efforts, by numerous judges and scholars, to formulate a fair expression of the test used to determine at what point an entity, which possesses monopoly power, has engaged in sufficient conduct to violate Sherman § 2.

Early in this Century, many, relying upon *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) and *United States v. American Tobacco Co.,* 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911), believed Sherman § 2 to be violated only by an entity possessing monopoly power and engaging in conduct which was independently violative of Sherman § 1.[24] While it is certainly true that

---

**19.** Monopoly power is defined as "the power to control prices or exclude competition." *United States v. Grinnell Corporation,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778, 786 (1966); *United States v. E. I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264, 1278 (1956).

**20.** In *United States v. United States Steel Corporation,* 251 U.S. 417, 451, 40 S.Ct. 293, 299, 64 L.Ed. 343, (1920), the Court stated: "[T]he law does not make mere size an offense, or the existence of unexerted power an offense. It, we repeat, requires overt acts and trusts to its prohibition of them and its power to repress or punish them. It does not compel competition, nor require all that is possible." *But see United States v. Swift & Co.,* 286 U.S. 106, 116, 52 S.Ct. 460, 463, 76 L.Ed. 999, 1006 (1932) where the Court stated: "Mere size, according to the holding of this court, is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly . . . ."

**21.** *United States v. American Can Co.,* 230 F. 859, 901 (D.Md.1916), *appeal dismissed,* 256 U.S. 706, 41 S.Ct. 624, 65 L.Ed. 1181 (1921).

**22.** *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir. 1945), quoted with express approval in *American Tobacco Co. v. United States,* 328 U.S. 781, 813, 66 S.Ct. 1125, 1140, 90 L.Ed. 1575, 1596 (1946).

**23.** *United States v. Aluminum Co. of America,* 148 F.2d 416, 430 (2d Cir. 1945).

**24.** As Judge Wyzanski observed in *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 341 (D.Mass.1953), the 1911 Standard Oil and American Tobacco "opinions encouraged the view that there was no monopolization unless defendant had resorted to predatory practices."

Section 1 of the Sherman Act, 15 U.S.C. § 1, now provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in

"[a]n enterprise has monopolized in violation of § 2 of the Sherman Act if it has acquired or maintained a power to exclude others as a result of using an unreasonable 'restraint of trade' in violation of § 1 of the Sherman Act," *United States v. United Shoe Machinery Corporation,* 110 F.Supp. 295, 342 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), it is doubtful that, even in 1911, § 2 prohibited *only* monopoly obtained by unlawful restraints and predatory practices, for such a rule would render § 2 wholly superfluous. In 1 Toulmin's Anti-Trust Laws § 15.5, p. 293 (1949), it is observed:

> [I]f a monopoly, accomplished by any means other than by contracts or combinations or conspiracies in restraint of trade, be not prohibited by the second section then that section performs no office whatever in the Sherman Law.

In stark contrast to the conception given § 2 in the early years of this Century is the opinion by Judge Learned Hand in *United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir. 1945). At certain points in the opinion, Judge Hand seems to say that monopolization occurs whenever an entity possessing monopoly power engages in any volitional business act. He reasons:

> Starting . . . with the authoritative premise that all contracts fixing prices are unconditionally prohibited, the only possible difference between them and a monopoly is that while a monopoly necessarily involves an equal, or even greater, power to fix prices, its mere existence might be thought not to constitute an exercise of that power. That distinction is nevertheless purely formal; it would be valid only so long as the monopoly remained wholly inert; it

> would disappear as soon as the monopoly began to operate; for, when it did—that is, as soon as it began to sell at all—it must sell at some price and the only price at which it could sell is a price which itself fixed. Thereafter the power and its exercise must needs coalesce. Indeed it would be absurd to condemn such contracts unconditionally, and not to extend the condemnation to monopolies; for the contracts are only steps toward that entire control which monopoly confers: they are really partial monopolies.[25]

As Judge Wyzanski determined from his reading of the *Alcoa* opinion, "Judge Hand said that one who has acquired an overwhelming share of the market 'monopolizes' whenever he does business, . . . apparently even if there is no showing that his business involves any exclusionary practice." *United Shoe Machinery Corporation, supra,* at 342. However, as Judge Wyzanski goes on to explain,

> this doctrine is softened by Judge Hand's suggestion that the defendant may escape statutory liability if it bears the burden of proving that it owes it monopoly solely to superior skill, superior products, natural advantages, (including accessibility to raw materials or markets), economic or technological efficiency, (including scientific research), low margins of profit maintained permanently and without discrimination, or licenses conferred by, and used within, the limits of law (including patents on one's own inventions, or franchises granted directly to the enterprise by a public authority).

*United Shoe Machinery Corporation, supra,* at 342. Despite this "softening," however, the *Alcoa* opinion contains a great deal of language that would indicate that, unless a

---

restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared by section 1 to 7 of this title to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by

imprisonment not exceeding three years, or both said punishments, in the discretion of the courts."

**25.** This excerpt from the *Alcoa* opinion was quoted with express approval by the Supreme Court in *American Tobacco Co. v. United States,* 328 U.S. 781, 813, 66 S.Ct. 1125, 1141, 90 L.Ed. 1575, 1596 (1946).

monopoly's "continued and undisturbed control" of a market "fell undesigned into [its] lap," unless the monopoly does "not seek, but cannot avoid, the control of the market," unless a monopoly's continued control of the relevant market has "been thrust upon it," unless it were "the passive beneficiary of a monopoly, following upon an involuntary elimination of competitors by automatically operative economic forces," it is guilty of monopolization. *United States v. Aluminum Company of America,* 148 F.2d 416, 428, 429, 430 (2d Cir. 1945). Judge Hand continues, at 431:

> It was not inevitable that [Alcoa] should always anticipate increases in the demand for ingot and be prepared to supply them. Nothing compelled it to keep doubling and redoubling its capacity before others entered the field. It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret "exclusion" as limited to maneuvers not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not "exclusionary." So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent.[26]

As indicated in the footnotes, the Supreme Court, in *American Tobacco Co. v. United States,* 328 U.S. 781, 813, 66 S.Ct. 1125, 90 L.Ed. 1575, 1596 (1946) "welcome[d] the opportunity to endorse" the *Alcoa* opinion in the particulars set forth above.

So broad was the sweep of the *Alcoa* opinion that many thought it inevitable that entities possessing monopoly power would face a rebuttable presumption that it was guilty of monopolization. Judge Wy-

zanski, in another of his examinations of Sherman § 2, stated in *United States v. Grinnell Corporation,* 236 F.Supp. 244, 248 (D.R.I.1964), aff'd except as to decree, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966);

> [I]n the two decades since [Alcoa], most of the cognoscenti have expected that a day would come when the Supreme Court would announce that where one or more persons acting jointly had acquired so clear a dominance in a market as to have the power to exclude competition therefrom, there was a rebuttable presumption that such power had been criminally acquired and was a monopolizing punishable under § 2. To be sure, the putative offender would be allowed to avoid or defeat this presumption if he bore the burden of proving that this share of the market was the result of superior skill, superior products, natural advantages, technological or economic efficiency, scientific research, low margins of profit maintained permanently and without discrimination, legal licenses, or the like.

The Supreme Court, however, declined to pass upon this question, commenting at footnote 7 of its opinion:

> Since the record clearly shows that this monopoly power was consciously acquired, we have no reason to reach the further position of the District Court that once monopoly power is shown to exist, the burden is on the defendants to show that their dominance is due to skill, acumen, and the like.

While refusing to pass upon the "rebuttable presumption" question raised below, the Court did, however, succinctly set forth a test for determining whether a party has monopolized in violation of Sherman § 2. At 570–71, 86 S.Ct. at 1704, 16 L.Ed.2d at 786, the Court stated:

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the rele-

---

**26.** That portion of this excerpt from the *Alcoa* opinion beginning with "It insists . . . ." was quoted with express approval by the Su-

preme Court in *American Tobacco Co. v. United States,* 328 U.S. 781, 813, 66 S.Ct. 1125, 90 L.Ed. 1575, 1596 (1946).

vant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

While one who possesses monopoly power clearly need not go so far as to engage in unlawful restraints, predatory practices, or conduct otherwise morally culpable or shocking before it transgresses Sherman § 2, it is unrealistic to conclude that Sherman § 2 requires all who possess monopoly power to cut their engines and drift aimlessly with the ebb and flow of natural market forces. The true restraint imposed by § 2 lies somewhere between these two extremes. While the test enunciated by the Supreme Court in *Grinnell* is a good and functional test for identifying those guilty of monopolization, it does not, by any means, end the uncertainties which pervade this area of the law. Nor does it easily resolve the application of the test to varying factual situations.

██ The difficulty in gaining a thorough understanding and appreciation for what the abstract law is with regard to the conduct element of the monopolization offense is surpassed by the difficulty in applying that law to the particular facts of this case. The Court initially is confronted with the proposition, beyond serious dispute, that, as a general rule, a newspaper publisher, for valid business reasons, may legally alter its distribution system from one which utilizes the independent contractor as an intermediary to one based on direct sales. As one court summarized the law:

Courts have uniformly refused to enjoin newspaper publishers from changing, for valid business reasons, their systems of distribution from that of independent distributors to direct sales. *Naify v. McClatchy Newspapers*, [1977] Trade Reg.Rep. (CCH ¶ 61,383 (N.D.Cal. April 21, 1977); *Knutson v. Daily Review, Inc., supra; McGuire v. Times Mirror Co.,* 405 F.Supp. 57 (C.D.Cal.1975); *Lamarca v. Miami Herald Publishing Co.,* 395 F.Supp. 324 (S.D.Fla.1975), aff'd, 524 F.2d 1230, (5th Cir. 1975) (without published opinion).

This is but a particularizing of the general authority of any manufacturer to distribute all of his own products himself rather than to use independent contractors for such distribution.

This Court, however, is not confronted with so simple a situation; rather, it is complicated by the fact that in this case, The Star concededly possesses monopoly power at the publication level. As such, questions which were irrelevant to a determination of the vast majority of the cases cited to the Court by The Star must be confronted here. They include, among others; (1) Does The Star in view of its admitted monopoly as publisher of its newspaper have the absolute right to change its method of distribution of its newspapers from the use of independent contract carriers to distribution by agents employed by The Star for that limited purpose?[27] (2) Will the change in method of distribution as proposed by The Star make it appreciably more difficult for other potential newspaper publishers to enter into the newspaper publishing market as a competitor to The Star?[28] (3) Would a potential newspaper publisher wishing to enter into this area as

---

**27.** See and compare, *Naify v. McClatchy Newspapers,* [1977] Trade Reg.Rep. (CCH ¶ 61,383 (N.D.Cal. April 21, 1977); *Knutson v. Daily Review, Inc., supra; McGuire v. Times Mirror Co.,* 405 F.Supp. 57 (C.D.Cal.1975); *Lamarca v. Miami Herald Publishing Co.,* 395 F.Supp. 324 (S.D.Fla.1975), aff'd, 524 F.2d 1230 (5th Cir. 1975) (without published opinion). See, also, Footnote 2.

**28.** Somewhat relevant at this point is the Supreme Court's caveat that "a single newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." *Lorain Journal Co. v. United States,* 342 U.S. 143, 154, 72 S.Ct. 181, 187, 96 L.Ed. 162, 172 (1951). In that case the newspaper was endeavoring to monopolize advertising.

a competitor of The Star need and use the independent contractor delivery system presently distributing for the Star?[29] (4) Are internal distribution costs a substantial barrier to others to entry into the newspaper business as a competitor of The Star?[30] (5) Could the need of a potential publishing competitor be met by independent entrepreneurs not currently in the newspaper trade?

Permeating many of these questions is what is the legal effect, if any, of The Star's history leading to its current monopoly as newspaper publisher in the Greater Kansas City area.

## IV

## CONCLUSION

■ Because of the seriousness and difficulty of the issues remaining to be litigated and in light of the irreparable harm which plaintiffs would suffer were the status quo not maintained, equity and good conscience mandate the issuance of a preliminary injunction.[31] Therefore, it is hereby

ORDERED that defendant be, and hereby is, enjoined, until further order of this Court, from terminating its existing contracts with plaintiffs; it is further

ORDERED that this cause be, and it is hereby, set for pretrial conference at 2:00 p. m., Thursday, October 27, 1977, Judge Hunter's Chambers, Room 613, United States Courthouse, 811 Grand Avenue, Kansas City, Missouri; it is further

ORDERED that this cause be, and it is hereby set for full trial on the merits to commence at 9:30 a. m., Monday, January 16, 1978, Judge Hunter's Courtroom, Sixth Floor, United States Courthouse, 811 Grand Avenue, Kansas City, Missouri.

Appendices to follow

---

**29.** See test stated in *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 803, 804 (9 Cir. 1976).

**30.** See Footnote 2.

**31.** In view of the result reached it is unnecessary to consider the contract issues that are separate from the monopoly issues.

## APPENDIX A
# CONTRACT

THIS CONTRACT is made and entered into this ........................ day of ...... ..................................................................................., 19 ............ ,

by and between........ ... ...... ........................................................................................, first party, and The Kansas City Star Company, a corporation, publisher of The Kansas City Star and The Kansas City Times, second party.

First party agrees to purchase from second party and second party agrees to sell and deliver to first party sufficient copies of newspapers as the same are published from day to day, and first party agrees to supply all regular subscribers for said newspapers in the

following territory, known as Route No. ........................ bounded as follows:

On the North by .................................................................................................................................................................................................

...................................................................................................................................................................................................................................

...................................................................................................................................................................................................................................

On the South by ......................................................

.................................................................................................

.................................................................................................

On the East by ....................................................... .

.................................................................................................

On the West by .......................................................

...................................................................................................................................................................................................................................

CLERK, U. S. DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
EXHIBITS
P_____ D_____
Case No. 75CV36-W-4

and first party agrees to receive said newspapers and deliver them regularly and promptly each day to all subscribers at their respective residences or places of business along said Route. First party recognizes that one of the most important duties under this contract is the delivery of the newspapers every morning and evening and if the delivery is not satisfactory to second party this contract can be cancelled as hereinafter provided.

First party agrees to pay to second party for all newspapers purchased by him and delivered by him to regular subscribers at the

following rates: ........................ ..................................percent ( . .............%) of the entire amount charged by first party (excluding sales or use taxes) to each regular subscriber for The Kansas City Star, The Kansas City Times, and Sunday edition of The Kansas City Star, computed

on a weekly basis; ... ...................................... ...........percent ( .... ........ %) of the entire amount charged by first party (excluding sales or use taxes) to each regular subscriber for The Kansas City Star and the Sunday edition of The Kansas City Star, computed on a weekly basis;

.......................... ...........................percent ( ...............%) of the entire amount charged by first party (excluding sales or use taxes) to each regular subscriber for The Kansas City Times and the Sunday edition of The Kansas City Star, computed on a weekly basis

For all extra copies of newspapers ordered by first party which are not distributed to regular subscribers but which are to be sold to newsboys or dealers or direct at retail to purchasers (or as a second copy of The Times, Star or Sunday Star to regular subscribers) first

party agrees to pay as follows:....... ................... cents per copy for The Kansas City Star, ......................... cents per copy for The Kansas

City Times, and ........................... cents per copy for the Sunday edition of The Kansas City Star.

The foregoing payments shall be made to second party weekly for newspapers received during the previous week and the bill is due and payable upon receipt by first party.

For the purpose of computing the rates above provided, first party agrees at the time of the execution of this contract to provide to second party a sworn statement in a form approved by second party which will notify second party of the entire amounts charged by first party for his regular subscriptions. First party also agrees to notify second party of any changes in entire amounts charged for regular subscriptions to his subscribers no later than seven days prior to the effective date of said changes in a sworn statement to second party in a form approved by second party.

To secure compliance with this contract, first party shall deposit at the signing hereof, with second party, ...........................

............................................................. Dollars (S ...................................).

Second party reserves the right to sell newspapers to others anywhere along said Route. Second party shall have the right to cancel this contract any time, by giving four days' notice of its intention to do so. First party agrees to keep for the benefit of and satisfactory to second party a complete route book, showing the name and address of every delivery on the above described Route, amounts charged for regular subscriptions, when every subscriber has made payment and the date to which each subscription is paid, and to furnish the same at any time second party makes request, whether prior or subsequent to cancellation of this contract.

It is further agreed that first party shall not sell or assign this contract, or any part thereof, without the written consent of second party, and first party agrees not to sell said newspapers outside of said Route, nor to sell or circulate any other newspaper, except by written consent of second party, during the existence of this contract.

It is agreed by and between the parties that first party, his agents and employees, in delivering and selling the newspapers herein mentioned, is acting as principal, on his own responsibility, and in no particular is he acting for, or in behalf of, or as agent of second party, and said first party shall have no right, power or authority to bind second party by any act or deed on his part or on the part of any of his agents, servants or employees, and first party agrees to indemnify and hold harmless second party from any loss or liability of whatsoever kind and character, arising out of or in any manner connected with the execution of this contract.

If first party shall not make said weekly payments for papers delivered at the time the same fall due, or shall at any time be in default of any sum under this contract, or shall violate or fail to comply with the terms of this contract in any particular whatever, then and in any such event this contract shall be deemed at an end, at the option of second party, and the sum deposited as aforesaid shall be thereby forfeited as liquidated damages to second party, but this shall not release first party from any sum he may owe.

Witness our signatures the day and year aforesaid.

.....................................................................................................

THE KANSAS CITY STAR COMPANY

By ...................................................................................................

Form 73A

## APPENDIX B
# DELIVERY AGENT CONTRACT

THIS CONTRACT made and entered into effective the _____ day of _____ , 19 _____ , by

and between The Kansas City Star Company, a corporation (hereinafter "The Star"), and _____

(hereinafter "Delivery Agent"), an individual residing at _____ .

WHEREAS, The Star owns and publishes certain daily newspapers known as *The Kansas City Star* and *The Kansas City Times;* and

WHEREAS, The Star requires services of Delivery Agent to deliver the newspapers owned by The Star regularly and promptly to regular subscribers, dealers, newsboys or others designated by The Star; and

WHEREAS, The Star may from time to time require the services of Delivery Agent to collect monies due The Star from regular subscribers, dealers, newsboys or other customers to whom The Star has sold or agreed to sell newspapers; and

WHEREAS, Delivery Agent desires to provide the above-described services of delivery and collection in a manner satisfactory to The Star;

NOW, THEREFORE, the parties agree as follows:

1. Delivery Agent hereby undertakes and agrees to provide satisfactory delivery of the newspapers published by The Star to all regular subscribers, dealers, newsboys or others designated by The Star. Delivery Agent recognizes and agrees that one of the most important duties under this contract is "satisfactory delivery" which is deemed to mean for the purposes of this contract regular and prompt delivery of the newspapers in readable and satisfactory condition, protected from reasonably foreseeable adverse weather conditions and delivered promptly after supply of the newspapers to Delivery Agent. Delivery Agent recognizes that if delivery is not satisfactory to The Star as herein described, this contract can be canceled as hereinafter provided.

2. The Star agrees to supply and Delivery Agent agrees to accept sufficient copies of said newspapers in order to deliver the same regularly and promptly each day to all regular subscribers and any others designated by The Star at their respective residences or places of business.

3. Newspapers to be supplied to Delivery Agent hereunder shall remain the property of The Star until delivery to all regular subscribers and others designated by The Star. Accordingly, risk of loss of newspapers and credit risks respecting customers shall remain that of The Star; provided, however, that nothing herein shall limit Delivery Agent's liability to The Star for any negligent or wrongful act respecting delivery of the newspapers or monies collected by Delivery Agent, or otherwise. Delivery Agent shall be the agent of The Star for collection and delivery only and shall have no right or authority to assume or create any other obligation of any kind, expressed or implied, on behalf of The Star, it being intended that Delivery Agent shall be and remain an independent contractor.

4. Until notified to the contrary by The Star, Delivery Agent will collect for newspapers delivered by Delivery Agent in accordance with either of the following: (a) monthly from regular subscribers and other customers for newspapers delivered during the preceding calendar month; or (b) monthly from regular subscribers and other customers for newspapers to be delivered during the succeeding calendar month; or (c) bi-monthly from regular subscribers and other customers for newspapers delivered during the preceding calendar month and for newspapers to be delivered during the succeeding calendar month. Delivery Agent will make collections in a form acceptable to The Star. The amount collected from each regular subscriber or other customer shall be at the applicable current rate charged by The Star (including any sales or use taxes) and Delivery Agent shall not impose any charge upon any regular subscriber or other customer of The Star for delivery or other services rendered pursuant to this contract.

5. Delivery Agent undertakes and agrees to remit sums collected from regular subscribers or other customers to The Star within five (5) days after receipt thereof by Delivery Agent. With respect to such collections, when remittances to The Star do not equal the total number of newspapers supplied Delivery Agent for delivery multiplied by The Star's applicable sales price for such newspapers, Delivery Agent shall submit to The Star, within five (5) days of a request by The Star, an affidavit in form satisfactory to The Star accounting for newspapers delivered for which collection was not made and newspapers returned to The Star by Delivery Agent, if any. The newspapers accounted for in such affidavit shall account for the entire difference between collections and newspapers placed with Delivery Agent for delivery. The Star will notify Delivery Agent of any monies received by The Star directly or by mail from regular subscribers or other customers and Delivery Agent will credit such sum to the accounts of regular subscribers or other customers on the subscriber and customer list maintained by Delivery Agent.

6. The Star will pay Delivery Agent a fee of _____ cents ( _____ ¢) per copy for each Monday through Saturday edition of the newspaper delivered by Delivery Agent to regular subscribers designated by The Star.

7. The Star will pay Delivery Agent a fee of _____ cents ( _____ ¢) per copy for each Sunday edition of the newspaper delivered by Delivery Agent to regular subscribers designated by The Star.

8. The Star will pay Delivery Agent a fee for each newspaper delivered by Delivery Agent to each customer designated by The Star, other than regular subscribers, or for samples Delivery Agent is requested to deliver by Star, as follows: _____ ¢ per copy for the Monday through Saturday edition of the newspaper and _____ ¢ per copy for the Sunday edition of the newspaper.

9. Delivery payments shall be made by The Star to Delivery Agent by the tenth day of each month or on the first regular business day thereafter for newspapers delivered by Delivery Agent during the preceding calendar month.

10. The Star will pay Delivery Agent a fee based on the following percentages of all monies (excluding sales or use taxes) collected or received from those to whom Delivery Agent makes delivery who subscribe to the Monday through Saturday editions of *The Kansas City Times* and *The Kansas City Star* newspapers and the Sunday edition of *The Kansas City Star* newspapers.

| Percentage of Collection | Collection Fee |
|---|---|
| 0- 75% | _____% of the sum collected, plus |
| 76- 90% | _____% of all sums collected over 76%, plus |
| 91-100% | _____% of all sums collected over 91% |

11. The Star will pay Delivery Agent a fee based on the following percentages of all monies (excluding sales or use taxes) collected or received from those to whom Delivery Agent makes delivery who have subscribed to the Monday through Saturday editions of *The Kansas City Times* newspapers and the Sunday edition of *The Kansas City Star* newspaper or Monday through Saturday editions of *The Kansas City Star* newspapers and the Sunday edition of *The Kansas City Star* newspaper.

| Percentage of Collection | Collection Fee |
|---|---|
| 0- 75% | _____% of the sum collected, plus |
| 76- 90% | _____% of all sums collected over 76%, plus |
| 91-100% | _____% of all sums collected over 91% |

12. The Star will pay Delivery Agent a fee based on the following percentages of all monies (excluding sales or use taxes) collected or received from those to whom Delivery Agent makes delivery who have subscribed to the Sunday edition of *The Kansas City Star* newspaper.

| Percentage of Collection | Collection Fee |
|---|---|
| 1- 75% | _____% of the sum collected, plus |
| 76- 90% | _____% of all sums collected over 76%, plus |
| 91-100% | _____% of all sums collected over 91% |

13. The Star will pay Delivery Agent a fee of _____ percent ( _____ %) of all monies (excluding sales or use taxes) collected or received from customers other than regular subscribers to whom Delivery Agent makes delivery, if The Star designates Delivery Agent to make delivery t, and/or collection from such other customers.

14. Collection fee payments shall be made by The Star to Delivery Agent on the tenth day of each month or on the first regular business day thereafter, for monies collected by Delivery Agent or received by The Star from regular subscribers, dealers, newsboys or other customers to whom Delivery Agent delivers newspapers during the preceding calendar month.

15. Delivery Agent undertakes and agrees to keep a complete subscriber and customer list showing the name and address of every delivery made by Delivery Agent, when every subscriber or other customer has made payment and the date to which each subscription is paid, the same to be for the benefit of and in a form satisfactory to The Star, and to furnish the same either within five (5) days at any time The Star may request or immediately upon the termination of this contract.

16. Delivery Agent agrees not to exhibit the subscriber and customer list or disclose any information contained therein or relating to the identity or addresses of any regular subscriber to any person, entity or group other than the authorized representatives of The Star or the employees of Delivery Agent who require such information in order to deliver the newspapers or otherwise comply with this contract, and Delivery Agent agrees to instruct Delivery Agent's employees not to disclose such information.

17. Delivery Agent shall defend, indemnify and hold The Star harmless from any and all liabilities, claims, demands, costs, charges and expenses incident to any claim, loss, damage or injury to the person or property of Delivery Agent or to the person or property of any person injured through the acts or negligence of Delivery Agent or of any of Delivery Agent's employees or others acting on Delivery Agent's behalf.

18. To secure compliance with this contract, including but not limited to the payment to The Star of all monies collected by Delivery Agent on

behalf of The Star, Delivery Agent shall deposit with The Star or its designee at the signing hereof the sum of _____ Dollars

(S _____ ). The Star shall add thereto semi-annually on January 31st and July 31st of each year interest at the rate of _____ per cent ( _____ %) per annum, provided that the amount required to be deposited shall have been so deposited in full for a period of three (3) months, prior to the date when interest payment is due. No portion of this deposit will be payable to The Star for any amount due from but unpaid by subscribers or other customers. Said deposit, less any monies that may be due The Star from Delivery Agent, shall be returned to Delivery Agent within sixty (60) days after termination or expiration of this contract if, but only if, Delivery Agent has within five (5) days after termination or expiration of this contract presented the complete subscriber and customer list to The Star. Otherwise, said deposit shall be deemed to be forfeited by Delivery Agent to The Star.

19. Delivery Agent may engage in any employment or other business so long as it does not interfere or conflict with the prompt, regular and satisfactory performance by Delivery Agent of Delivery Agent's obligations under this contract.

20. Without prior approval by The Star, Delivery Agent shall not insert any material into any newspaper distributed pursuant to this contract, imprint anything on such newspapers whether by stamp or otherwise, attach any item to said newspapers or put such newspapers within any imprinted wrapping, covering or container.

21. It is mutually understood and agreed by both Delivery Agent and The Star that all rights and obligations hereunder are personal and non-assignable and may not be the subject of sale, devise or hypothecation.

22. Delivery Agent avers and affirms that he or she has not given nor agreed to give any person, firm, corporation, association or other entity not a party to this contract anything of value which is in any way related to the rights or obligations conferred upon Delivery Agent by this contract and that the sole and only consideration given by either party hereto for said rights and obligations are set forth within this contract document.

23. This contract shall automatically expire _____ months from the effective date hereof, however, it is mutually understood and agreed that if either party hereto shall at any time be in default in making any remittance or payment herein provided to the other at the time the same is due, or shall violate or fail to conform with the terms of this contract in any particular whatever, then and in any such event this contract shall be deemed at an end, at the option of the other party. In the event that Delivery Agent fails to satisfactorily deliver the newspapers as defined in this contract, Delivery Agent agrees to reimburse The Star for all reasonable and necessary costs and expenses incurred by The Star for performance of Delivery Agent's contractual obligations during the period Delivery Agent does not perform satisfactory delivery services and such costs and expenses shall include attorneys' fees incurred in the collection of such costs and expenses.

IN WITNESS WHEREOF, the parties have duly executed this contract this _____ day of _____, 19 _____.

_____
Delivery Agent

THE KANSAS CITY STAR COMPANY

By _____

_____ Circulation Manager

CLERK, U. S. DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
EXHIBITS:
P. _____ D _____
Case No. 75 CV 36-7-4