**CONFEDERATED HOUSING ASSOCIATES, INC., Plaintiff,**

**v.**

**DEPARTMENT OF HOUSING & URBAN DEVELOPMENT; John T. Suskie, Area Manager, Department of Housing & Urban Development, Housing Authority of the City of North Little Rock; William S. Clements, Executive Director, Housing Authority of the City of North Little Rock; and Boucher, Slack and Bronner, a Joint Venture, Defendants.**

**No. LR–C–82–272.**

United States District Court,
E. D. Arkansas, W. D.

May 17, 1982.

---

George E. Pike, Jr., Friday, Eldredge & Clark, Little Rock, Ark., for plaintiff.

Richard M. Pence, Jr., Asst. U. S. Atty., Little Rock, Ark., for HUD.

Sam Hilburn and Janet L. James, North Little Rock, Ark., for Housing Authority of North Little Rock and William S. Clements.

Martin G. Gilbert, Coleman, Gantt, Ramsay & Cox, Pine Bluff, Ark., for Boucher, Slack and Bronner.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WOODS, District Judge.

### FINDINGS OF FACT

1. Confederated Housing Associates, Inc. (Confederated) is a corporation organized under the laws of the State of Tennessee with its principal office and place of business in Tennessee. The Department of Housing & Urban Development is an agency of the United States existing pursuant to 42 U.S.C. § 3532. John T. Suskie (Suskie) is the manager of Area 6.2S of Region VI of HUD which area includes north Little Rock, Arkansas and whose office is located in Little Rock, Arkansas. The Housing Authority of the City of North Little Rock (HA) is a housing authority organized under the laws of Arkansas, Ark.Stat.Ann. §§ 19–3001 et seq. and ordinances of the City of North Little Rock, with its office and place of business in North Little Rock. William S. Clements (Clements) is the director of HA. Boucher, Slack and Bronner (BSB) is a joint venture organized under the laws of Arkansas with its principal office and place of business in Pine Bluff, Arkansas.

2. Early in 1981, HA obtained HUD approval to proceed in accordance with the Turnkey method of development enacted by HUD in contemplation of construction of a seventy-four unit, mini-rise project for the elderly and handicapped to be developed in accordance with said Turnkey regulations, HUD being the entity responsible for total funding of the project.

3. On February 20, 1981 the first notice for invitation of proposals was published which stated that proposals for the project were to be received until 2:00 p. m. on April 28, 1981 at 2201 Division Street, North Little Rock, Arkansas at which time all proposals would be opened and read at that address.

4. The time and place for submitting the proposals was changed as set forth in Addendum 3 to the Develóper's Packet (Pl. Ex.1) submitted to all prospective bidders which addendum provided as follows:

CHANGE:

Reference GENERAL INFORMATION, Paragraph 1, Page 5, of Developer's Packet: Delete first sentence. Substitute:

1. "Proposals for the design and development of the project will be accepted by the Housing Authority of the City of North Little Rock at its offices at 2201 Division Street, Post Office Box 516, North Little Rock, Arkansas 72115, telephone (501) 758–8911, until 1:00 p. m. on the 28th day of April, 1981. All proposals received to that time and date will be publicly opened and read at 2:00 p. m. at the following address: Willow House

**1160**

Apartment Building, located at 2500 N. Willow Street, North Little Rock, in the Chapel of said building." All other conditions of referenced paragraph shall remain unchanged.

5. Proposals were to be prepared, submitted, evaluated and a contract awarded for the successful proposal only with the approval of HUD pursuant to the rules, regulations and standards set forth in the Developer's Packet (Pl.Ex. 23) which included the HUD handbook, chapter 7 and the regulations contained in the appendix of the handbook (Pl.Ex.3).

6. Prior to the 1:00 p. m. deadline for submission of proposals set forth in Addendum No. 3 to the Developer's Packet, BSB and one other developer, not Confederated, verbally requested what time the proposals must be submitted and were advised by Clements, verbally, that the submission deadline was 2:00 p. m. No other developers were so advised and the response of Clements was not reduced to writing. This procedure violated the procedure set forth in the Developer's Packet for clarification of the invitation for proposals.

7. A proposal was submitted by Confederated at 12:55 p. m. on said date; a proposal was submitted by BSB at 1:38 p. m. on said date.

8. The developer was to be paid for construction by HA with funds received by HA from HUD in exchange for notes executed by HA and sold to investors, guaranteed 100% by HUD. HA was to repay these notes over a period of years primarily with funds received by HA from HUD in the form of annual guaranteed grants.

9. Prior to the submission of its proposal on April 28, 1981, BSB's architect conferred with Clements and obtained supplemental information, clarification and interpretation regarding matters desired by HA to be included in the BSB proposal. All such requests were made verbally and the response given verbally. Other developers were not given this information. BSB's proposal was altered to conform to these verbal responses of Clements. The procedure set forth in the Developer's Packet for obtaining written supplemental information, clarification and interpretation of the Developer's Packet required all such requests and responses to be in writing and to be given not less than ten days prior to the bid submission date. (Developer's Packet, p.6, Pl.Ex.23) This procedure was not followed by the above exchanges between BSB's architect and Clements. As a result of these exchanges, BSB obtained a substantial advantage over other developers in submission of its proposals.

10. Confederated's proposal for the 25th and Division Street location, Phase I, was in the amount of $2,839,355.00, which was $644,995.00 less than BSB's proposal for Phase I at the same site.

11. HA retained the services of Mr. Paul Kinsey, a disinterested expert consultant, to prepare the Developer's Packet in consultation with HA and with the approval of HUD. The purpose of the Developer's Packet was to advise the developers of the details of the type project that HA desired as well as to establish the procedure for preparation, submission, evaluation and awarding. Mr. Kinsey was also retained by HA to evaluate the proposals submitted in accordance with the Developer's Packet.

12. Between April 28, 1981 and June 22, 1982, Kinsey and Clements studied all proposals and Kinsey prepared a detailed evaluation of each of the proposals. On June 22, 1981 at a special meeting of the Board of HA, Kinsey presented his rankings of all proposals for Phase I (74 unit mini-rise for the elderly) and Phase II (30 unit family project). (Pl.Ex.4) Clements was present and voiced no objection with the rankings or the number of points given to the proposals. Confederated was ranked number one for Phase I with 96 out of 100 points. BSB was ranked number five with 58 points for its proposal at the same site, 25th and Division Streets.

13. Immediately following the June 22, 1981 meeting, Clements, Kinsey, Mr. Beaman of Confederated and Confederated's architect, Mr. Hudspeth, met in the office of Clements and were advised that Confed-

erated's number one ranked proposal would be submitted to the HA Board at its next regular meeting on July 6, 1981, that approval by the Board would be a mere formality and that it was not necessary that any representative of Confederated attend the meeting. Clements did not advise Confederated to the contrary prior to the July 6, 1981 meeting of the Board.

14. Sometime between June 22, 1981 and July 6, 1981, Clements had lunch at Fisher's Cafe in North Little Rock with representatives of BSB and BSB's architect. At that meeting, the housing project at issue was discussed.

15. Sometime between June 22, 1981 and July 6, 1981, Clements called Mr. Taggart, BSB's architect, and requested him to come to the office of HA, pick up a copy of Kinsey's worksheet for his evaluation of BSB, showing in detail the specific objections Kinsey made of the BSB proposal (Pl.Ex.6). Clements requested Taggart to write a letter to him for presentation to the Board of HA outlining what BSB would do to satisfy Kinsey's objections. No other developer was given access to Kinsey's worksheets by Clements or any other person.

16. In response to Clements' request to Taggart, Taggart drafted letters dated June 30, 1981 for BSB's signature responding item by item to the deficiencies outlined in Kinsey's worksheet concerning BSB's proposals on Phase I and Phase II (Pl.Ex. 24 and 25).

17. Those two letters of BSB were read in full to the Board at the July 6, 1981 meeting, prior to a vote of the Board selecting a proposal. The Board was not advised that no other developer had been given access to the Kinsey worksheets and asked to write a letter in response to the deficiencies outlined in Kinsey's worksheets. Sometime prior to July 6, 1981, Clements prepared his personal evaluation of the proposals submitted by the various bidders on April 28, 1981. Clements' evaluation of the Phase I proposals differed from Kinsey's evaluation only with respect to two bidders; Confederated and BSB. Criticisms of pro-

posals (other than Confederated and BSB) by Kinsey were substantially adopted and mirrored in Clements' evaluation; criticisms by Kinsey of the BSB proposal were for the most part rejected; and criticisms by Kinsey of the Confederated proposal were adopted and expanded by Clements. (On Phase II, Clements accepted completely the Kinsey rankings to the exact decimal point except for reducing the points assigned to Sanders & Associates, Inc., ranked number one by Kinsey, from 76.5 points to 68.5 points resulting in BSB's moving into number one position on Phase II.) At the July 6, 1981 meeting Clements advised the Board that he rejected Kinsey's evaluation and that he ranked BSB's proposal on Phase I for 25th and Division as number one. Three representatives of BSB and two representatives of BSB's architect were present at the meeting. Pursuant to Clements' direction, no representative of Confederated was present. (See Finding No. 13, *supra*.) The Board voted, with one dissent, to accept Clements' recommendation and award the contract to BSB on Phase I at 25th and Division Streets.

18. Thereafter, on July 10, 1981, Clements forwarded to HUD for approval his ranking of all proposals (Pl.Ex.8). He also forwarded to HUD his worksheets in support of his rankings. He did not forward to HUD Kinsey's evaluations on any proposals or Kinsey's worksheets, although HUD was aware from conversation with Clements that Kinsey had been hired to prepare the Developer's Packet and to evaluate the proposals and that Kinsey's evaluations were rejected by Clements.

19. HUD approved the acceptance of the proposal of BSB for Phase I. Confederated protested to HA and HUD requesting that the BSB proposal be rejected and Confederated's proposal be accepted. By letter of April 9, 1982 (Pl.Ex.15), HUD rejected Confederated's request and advised that closing would be scheduled at 11:00 a. m. on April 12, 1982.

20. On April 22, 1982 Confederated sent a letter to the Secretary of HUD in Washington requesting a hearing and advising

that litigation would ensue if no response was promptly received. To the date of the hearings on April 28, April 29 and April 30, 1982, no response had been received from the Secretary of HUD. (Pl.Ex.17)

21. The evaluation of the proposals by Paul Kinsey was uniform, objective, impartial and in substantial compliance with the requirements of the Developer's Packet, including the applicable HUD regulations. There were three errors in his comments regarding BSB, namely, the inclusion of items q, r and s which related to Phase II instead of Phase I, but these items were not substantial and would not have altered Kinsey's rankings.

22. Clements' evaluation of Confederated and BSB's proposals was not uniform, objective, impartial and in substantial compliance with the requirements of the Developer's Packet, including the applicable HUD regulations. Several of the criticisms made by Clements of the Confederated proposal for 25th and Division Streets were matters that should have been but were not included in the Developer's Packet, if such was the desire of HA to have those items. Confederated should not have been penalized for failing to include items that were not so included in the Developer's Packet. Some of these items were matters that were wrongfully discussed between Clements and BSB's architect prior to the submission of BSB's proposal, giving BSB the unfair advantage of complying with desires of Clements that should have been contained in the Developer's Packet.

23. If defendants are not enjoined by this Court, defendants plan to close the sale between HA and BSB and immediately proceed with construction of the seventy-four (74) unit project.

24. There is no disagreement between HA and HUD that Confederated's proposal for Phase I, 25th and Division, is the next highest ranked proposal if the BSB proposals are rejected.

## CONCLUSIONS OF LAW

1. The only serious question presented by this litigation is whether this Court has jurisdiction to redress the gross improprieties surrounding the acceptance of the proposal by the HA. The Defendants vigorously urge that this Court has no jurisdiction because the contract is with a non-federal agency, HA. They rely on *Estey Corp. v. Matzke*, 431 F.Supp. 468 (N.D.Ill. 1976). However, this case arose before the enactment of the 1976 amendments to 28 U.S.C. §§ 1331(a) and 1391(c) and the Administrative Procedure Act, 5 U.S.C. §§ 702, 703. It also proceeds on the erroneous basis that the Administrative Procedure Act grants an independent basis for federal jurisdiction. This view was rejected by the Supreme Court in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), the Court noting that the Seventh Circuit (Illinois) had adhered to that erroneous view, in contrast to the Eighth Circuit. See 430 U.S. at 104 n. 4, 97 S.Ct. at 983 n. 4. We agree with the plaintiff that jurisdiction is established under 28 U.S.C. § 1331. At least one court has held that the issue of whether the Administrative Procedure Act authorizes judicial review of the administrative (HUD) handling of a particular set of facts is one "arising under" federal law and thus covered by 28 U.S.C. § 1331. *Davis Associates, Inc. v. Secretary, Dept. of Housing & Urban Development*, 498 F.2d 385, 389 (1st Cir. 1974). The Second Circuit has held that a tenant has a cause of action under 28 U.S.C. § 1331 against the owner of property financed by a federally insured mortgage for violation of a HUD regulation, if the requisite jurisdictional amount was present. *McGuane v. Chenango Court, Inc.*, 431 F.2d 1189, 1191 (2d Cir. 1970), *cert. denied* 401 U.S. 994, 91 S.Ct. 1238, 28 L.Ed.2d 532 (1970). As noted, *supra*, 28 U.S.C. § 1331 was amended in 1976 to remove the requirement of a jurisdictional amount in cases involving a federal question. Pub.L. 94–574, October 2, 1976, § 2, 90 Stat. 2721. "The reference in section 1331 to 'laws . . . of the United States' means that there is jurisdiction of a claim arising under an . . . administrative regulation. . . ." Wright, Miller & Cooper, Federal Practice and Procedure, Jurisdiction, Sec-

tion 3563, *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3 (3rd Cir. 1964). Therefore "[i]t is beyond dispute that validly issued administrative regulations ... may be treated as 'laws of the United States' under Section 1331(a)." *Chasse v. Chasen*, 595 F.2d 59, 61 (1st Cir. 1979).

This case differs from cases that denied a private right of action by private developers against local housing authorities where jurisdiction was based on the overall national housing policy codified in the New Communities Act of 1968 and the Urban Growth and New Community Development Act of 1970. *Cedar-Riverside Assoc. v. City of Minneapolis*, 606 F.2d 254 (8th Cir. 1979) and *M. B. Guran Co., Inc. v. City of Akron*, 546 F.2d 201 (6th Cir. 1976). The courts in *Cedar-Riverside* and *M. B. Guran* were confronted with the argument that Congressional intent to create a private cause of action could be gleaned from a reading of general policy statements reflected in the introductory sections of these Acts. Here we are not faced with generalized policy statements. In the instant case, we are concerned with the enforcement of validly enacted administrative regulations, promulgated with the intent of ensuring that a specific class of persons (private developers) is not subjected to inequitable procedures when participation in federally funded projects is attempted.

In the handling of these bid proposals, many HUD regulations and guidelines set out in Chapter 7 of the HUD handbook governing this project were violated including the following: 24 C.F.R. 841.203; 24 C.F.R. 841.204; Chapter 7 of HUD Handbook re: Turnkey Projects—7–5a, 7–5d(i)(1), 7–5d(1)(m), 705e(2), 7–5f, 7–7b, 7–7e and 7–8c(2).

■ The federal defendant also proffered the defense of sovereign immunity. This contention is without merit in view of the 1976 amendments to 5 U.S.C. §§ 702, 703. Pub.L. 94–574 approved October 21, 1976. These amendments removed the defense of sovereign immunity as a bar to judicial review of federal administrative action otherwise subject to judicial review.

■ 2. The proposals of BSB were submitted after the deadline for submission of proposals on April 28, 1981, which was 1:00 p. m.

3. The proposals of BSB for Phase I were prepared in violation of the rules set forth in the Developer's Packet by reason of the conduct of BSB's architect and Clements in giving supplemental information, clarification and interpretation of provisions of the Developer's Packet, verbally without giving all developers an equal opportunity to obtain information about the desires of Clements or HA that should have been in the Developer's Packet or available to all developers by written correspondence more than ten (10) days prior to the submission date.

4. The conduct of Clements in calling BSB's architect between June 22, 1981 and July 6, 1981 and requesting that he come to Clements' office, obtain a copy of Kinsey's worksheets, and write a letter to the Board outlining his response to those comments, gave an unfair advantage to BSB over other developers prior to the July 6, 1981 meeting, in violation of the requirements of the Developer's Packet that the proposals be prepared, submitted and evaluated fairly and uniformly, to promote open and free competition.

5. HUD's acceptance of the Clements evaluations without examining the evaluations of the independent consultant (Kinsey) retained, constitutes an arbitrary and capricious failure of HUD to discharge its responsibility to ensure that the selection of developers for projects, such as at issue, is made in compliance with governing HUD regulations and done in a manner which does not give unfair advantage to any particular developer.

6. In light of the Conclusions of Law numbered 2 through 5, the Court concludes that the HA acted in violation of the applicable HUD regulations (See Concl. No. 1) in selecting BSB as the developer for Phase I and that HUD acted arbitrarily and capriciously in approving this selection.

 7. Confederated has met its burden of proving that it is entitled to a preliminary injunction. *Dataphase Systems, Inc. v. C. L. Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981). It is probable that Confederated will succeed in obtaining a permanent injunction requiring HA and HUD to reject the proposal of BSB and accept the proposal of Confederated for the 25th and Division Street location, Phase I.

In evaluating the threat of irreparable injury, this Court concludes that the public interest must not be overlooked. See, e.g., *Paschall v. Kansas City Star Co.*, 441 F.Supp. 349, 359 (WD Mo.1977). While the private party plaintiff's legal remedies arguably are adequate, the injury to the public would be irreparable. The public would, if plaintiff succeeded on its damage claim (but was denied preliminary injunctive relief), be required to pay an inflated price for Phase I of this project. Furthermore, the damage to public confidence resulting from the facts of this case could not be the subject of adequate compensation. The public interest overwhelmingly weighs in favor of granting a preliminary injunction in order to give the public the opportunity of saving $644,995.00, avoiding the waste by payment for partial construction and the destruction of a building by BSB and awarding of damages to Confederated which would yield nothing of benefit to the public. The public interest will also be served by not allowing BSB to gain the benefit of being awarded a proposal in violation of federal law. Suffice it to say that this Court finds that the balance of hardships between the parties as well as the public tips decidedly in favor of granting injunctive relief.

8. Confederated is, therefore, entitled to and the Court does hereby award to it a preliminary injunction forbidding all defendants from taking any steps to complete the processing of a contract of sale to BSB pending a final determination by this Court on the prayer for a permanent injunction or damages.

9. In light of the Court's Findings of Fact and Conclusions of Law, *supra*, the Court concludes that a bond should not be required of the plaintiff as a condition of the granting of injunctive relief.